FILED
SEP 2 9 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ________ DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| **ARNULFO REYES et al.,** **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIV NO. DR-24-CV-52-AM** |
| | § | |
| **JUAN MALDONADO et al.,** **Defendants.** | § | |

# ORDER

On May 24, 2022, a lone teenage gunman opened fire at Robb Elementary School in Uvalde, Texas. Three minutes after arriving at the school, he entered two connected classrooms, and over a timespan of seventy-four minutes, he murdered nineteen students and two teachers. State, city, county, and school district law enforcement officers responded to the scene within minutes, but no one entered the two classrooms for the full seventy-four minutes that followed. The massacre ended only when federal officers finally breached one of the classroom doors and killed the shooter within seconds.

The Plaintiffs are the parents of three children who died and seven who survived, as well as Arnulfo Reyes, a teacher who sustained multiple gunshot wounds during the tragic events of that day. The Plaintiffs bring claims under 42 U.S.C. § 1983 against Uvalde Consolidated Independent School District (UCISD), as well as the following responding officers, supervisors, and personnel: (1) the Texas Department of Public Safety ("TXDPS") Defendants: Sergeant Juan Maldonado, Trooper Crimson Elizondo, Trooper Richard Bogdanski, Special Agent Luke Williams, Captain Joel Betancourt, Regional Director Victor Escalon, Texas Ranger Christopher Kindell, and TXDPS Does 1 through 84; (2) UCISD Police Department ("UCISD-PD") Defendants: Chief Pedro Arredondo, Officer Adrian Gonzales, and Officer Jesus "JJ" Suarez; and

(3) Mandy Gutierrez, the school principal. According to the Plaintiffs, the Defendants, while acting under the color of state law, violated the Plaintiffs' and their children's Fourth and Fourteenth Amendment rights.[1] The Plaintiffs' claims were brought individually, as next friends of the surviving children, as wrongful death beneficiaries of the deceased children, and/or as representatives of the estates of the deceased minors.

One day after filing the original complaint, the Plaintiffs filed an Amended Complaint.[2] (ECF No. 4) The Defendants subsequently filed the following motions to dismiss, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, seeking dismissal based on a lack of standing, failure to state a claim, and qualified immunity: (1) Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Arredondo [ECF No. 20]; (2) Motion to Dismiss by Defendants Betancourt, Bogdanski, Elizondo, Escalon, Kindell, Maldonado, and Williams [ECF No. 22]; (3) Motion to Dismiss Plaintiff's Amended Original Complaint by Defendant Suarez [ECF No. 23]; (4) Motion to Dismiss by Defendant Gutierrez [ECF No. 26]; (5) Motion to Dismiss Amended Original Complaint by Defendant Gonzalez [ECF No. 28]; and (6) Motion to Dismiss by Defendant UCISD [ECF No. 29]. The Plaintiffs later filed a Notice of Voluntary Dismissal of Defendant Mandy Gutierrez [ECF No. 31], thus mooting her pending motion to dismiss [ECF No. 26].

After considering the motions to dismiss and the parties' briefings, the Court finds that the Defendants are all entitled to dismissal of the claims against them. The Court is sympathetic to

[1] The Plaintiffs also allege products liability claims against Motorola Solutions, Inc., who purportedly "designed and/or sold the radio communication devices used by some of the first responders while responding to the Robb Elementary School Shooting on May 24, 2022." (ECF No. 4 at 18.) Motorola has subsequently filed a Motion for Summary Judgment [ECF No. 49], which the Court will address in a separate order.

[2] Aside from changing the title of Section F from "March 24, 2022" to "May 24, 2022," the two complaints are indistinguishable. (ECF Nos. 1, 4.)

the pain and suffering endured by all victims of this tragedy. However, Fifth Circuit and Supreme Court case law forecloses the Plaintiffs' claims.

## I. ALLEGED FACTS[3]

In the wake of numerous school shootings, schools across the nation have implemented a standard protocol in responding to an active shooter situation. This protocol, which was posted at Robb Elementary School just inside the classroom doors, states: "LOCKDOWN: LOCKS, LIGHTS, OUT OF SIGHT." Essentially, students and teachers are trained to lock the doors, turn out the lights, and stay out of sight until law enforcement arrives. Law enforcement, in turn, is trained to follow the ALERRT doctrine ("Advanced Law Enforcement Rapid Response Training"), requiring officers on scene to immediately isolate and neutralize a shooter in order to stop the killing, stop the dying, and evacuate the injured.

On May 24, 2022, much of this law enforcement training went unheeded in Uvalde, Texas. At approximately 11:28 a.m. on May 24, 2022, a young man crashed his truck into a ditch approximately 100 yards from Robb Elementary School. Armed with a Daniel Defense DDM4v7 AR-15 style rifle and multiple high-capacity 30-round magazines containing NATO 5.56 cartridges, he traversed the school's five-foot high perimeter fence and shot at classrooms as he walked by them. At approximately 11:33 a.m., he proceeded through the West building through an unlocked door and entered either Classroom 111 or 112, where students were in lockdown mode and hiding to the best of their ability. After announcing it was "time to die," the young man shot Plaintiff Arnulfo Reyes, the teacher in Classroom 111, as well as numerous other students.

Initial law enforcement responders arrived at the scene within minutes, and ultimately, *hundreds* of law enforcement officers from numerous state, county, city, and federal agencies

[3] In a sprawling complaint, the Plaintiffs identify specific conduct of each named defendant in their complaint. For the sake of brevity, however, the Court will not specify the alleged acts of each defendant, as ultimately, the acts, even when considered as a whole, do not survive a Rule 12(b)(6) analysis.

responded to the shooting. But despite persistent gunfire from within the classrooms, law enforcement officers disregarded ALERRT policy after determining the shooter was using an AR-15 rifle. Fearing for their own safety, officers claimed they did not have adequate fire power to respond and therefore requested and waited for additional equipment, shields, and rifles. Some officers even tried to negotiate with the shooter.

More and more officers congregated inside and outside the school. Desperate parents attempted to reach the children themselves, but troopers from the Texas Department of Public Safety maintained a perimeter outside the school to prevent outsiders from approaching. Meanwhile, students and teachers inside the classroom were dead, dying, or frightened, with no path to safety and no access to medical assistance. Chillingly, as officers waited outside the classrooms, the shooter sat at Arnulfo Reyes's desk, periodically taunting him and splashing him with water to see if he would move.

At 12:10 p.m., a student in one of the classrooms with the shooter bravely called 911 and reported that there were numerous victims in the classrooms and others needed help. Dispatch instructed her to remain quiet and not open the door, despite ongoing gunfire in the next room. The officers outside the classrooms also heard the shots yet still refrained from entering. Instead, they continued to negotiate with the shooter and attempted to find a key to unlock the classrooms, even though Classroom 111 was already unlocked, unbeknownst to them. One of the shots they heard was fired at close range into Arnulfo Reyes's back.

At 12:24 p.m., a medic near the scene noted that the victims had been bleeding for a while. Officers, however, did not permit the medic to approach the classrooms. At 12:48 p.m., U.S. Border Patrol Tactical Unit ("BORTAC"), a specialized unit of the United States Border Patrol, prepared to breach the door. One officer, however, instructed BORTAC to stand by. Disregarding

the command, BORTAC breached the door at 12:49 and shot and killed the shooter at 12:50 with no serious injuries to the entry team. Arnulfo Reyes miraculously survived the multiple gunshot wounds he sustained. The same cannot be said for R.T., U.S.G., A.J.G., as well as sixteen other students and two other teachers inside classrooms 111 and 112.[4]

## II. LEGAL BACKGROUND

After the shooting, the Plaintiffs filed the present cause of action. In the Plaintiffs' Amended Complaint, the Plaintiffs bring three claims under 42 U.S.C. § 1983 against the TXDPS Defendants and the UCISD-PD Defendants (collectively the "Law Enforcement Defendants"): (1) a Fourteenth Amendment substantive due process claim based on a special relationship/failure to protect (Count 1); (2) a Fourteenth Amendment substantive due process claim based on a state created danger (Count 2); and (3) a Fourth Amendment unlawful seizure claim (Count 3). Liberally construing the complaint, they also bring a Fourteenth Amendment claim based on the interference with the parent-child relationship.

To briefly summarize the claims against the Law Enforcement Defendants, the Plaintiffs allege that the Law Enforcement Defendants violated the Plaintiffs' and children's Fourth Amendment rights by involuntarily confining the children and their teachers in the classrooms with the shooter and physically preventing the parents from rescuing their children. They also allege that the Law Enforcement Defendants violated their due process right to a parent-child relationship by physically restraining parents from entering the school premises to rescue their children. Finally, they argue that the Law Enforcement Defendants violated the Fourteenth Amendment due process rights to bodily integrity of Mr. Reyes and the children by surrounding

[4] In ruling on the motions, the Court takes the Plaintiffs' alleged facts as true. However, the Court notes that the Plaintiffs' allegations are sometimes inconsistent with allegations in similar cases, as well as the facts and timeline developed during an extensive federal investigation into the shooting.

the classrooms and leaving them trapped inside with no realistic means of escape, knowing that those inside the school were required to stay in place during an active shooter scenario with the door closed until law enforcement arrived and opened the door.

The Plaintiffs also bring claims against UCISD and Defendant Arredondo in his official capacity (collectively the "Municipal Defendants"), arguing that the official policies of the Municipal Defendants or their final decisionmakers were the driving force behind the Law Enforcement Defendants' violations of their constitutional rights (Counts 4 and 5). Instead of ensuring that law enforcement properly responded to an active shooter incident, the final policy makers adopted a policy of confining the classroom occupants with the active shooter and increasing the danger to them. They also allege that the Municipal Defendants failed to properly train their employees on responding to active shooter situations, with deliberate indifference to the Fourth and Fourteenth Amendment rights of students and teachers who would be locked down during an active shooter event.

The Law Enforcement Defendants and the Municipal Defendants all filed motions to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and/or Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. In these motions, the Law Enforcement Defendants argue they are entitled to qualified immunity because they did not violate the Plaintiffs' clearly established constitutional rights, where (1) the parents and classroom occupants were not seized for purposes of the Fourth Amendment; (2) no special custodial relationship exists in a school setting to trigger the Fourteenth Amendment due process clause; and (3) the Fifth Circuit has never recognized a due process claim based on a state created danger. The Law Enforcement Defendants also argue that the Plaintiffs' allegations are far too sparse to establish that any individual Law Enforcement Defendant violated the Plaintiffs' constitutional

rights, where, according to the Plaintiffs, most of the Defendants were simply present during the shooting.

The Municipal Defendants, in turn, argue that the Plaintiffs have not identified a policy of any final policymaker that was the driving force of any constitutional violation. They also argue that the official capacity claims are simply duplicative claims against the municipalities themselves and should be dismissed. Finally, all of the Defendants argue that the Plaintiffs, as parents, lack standing to bring §1983 claims in their individual capacities.[5]

In an omnibus response to the numerous motions to dismiss, the Plaintiffs maintain they sufficiently allege violations of the Plaintiffs' clearly established constitutional rights under both the Fourth and Fourteenth Amendments. Seemingly recognizing the sparsity of the allegations against each individual defendant, the Plaintiffs argue that the Law Enforcement Defendants are collectively responsible for the acts of each other under a bystander theory of liability. They also argue that most circuits have adopted a due process claim based on a state created danger and urge this Court to follow suit. Finally, they argue that a special custodial relationship existed between the Law Enforcement Defendants and those inside the classrooms, where (1) officers were surrounding the classroom and preventing the shooter from leaving, and (2) active shooter policy required the teachers and students to stay in place until they were rescued by law enforcement. Thus, the Law Enforcement Defendants had a duty to promptly rescue the teachers and students from harm, which they failed to do. These factors, say the Plaintiffs, also amounted to a Fourth Amendment seizure, which led to increased harm.

In response to the Law Enforcements Defendants' invocation of qualified immunity, they argue that the acts of the Law Enforcement Defendants were so egregious that any reasonable

---

[5] None of the motions to dismiss challenge Mr. Reyes's standing to bring suit for the injuries he suffered during the shooting.

officer would have known that what they were doing was in violation of the Plaintiffs' constitutional rights.[6] Finally, they argue (1) they sufficiently allege the existence of a policy, a policymaker, and a constitutional violation to withstand dismissal of their claims against UCISD, and (2) it is premature to dismiss the official capacity claims against Arredondo.

## III. ANALYSIS

### A. Rule 12(b)(1)

The Court will first begin with the Defendants' Rule 12(b)(1) arguments. Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996)). The "threshold question in every federal case" is "determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Therefore, "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In defending against a Rule 12(b)(1) motion, the party asserting jurisdiction bears the burden of proving that jurisdiction exists. *Id.* Courts assessing subject matter jurisdiction under Rule 12(b)(1) may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.*

[6] The Plaintiffs also argue that the doctrine of qualified immunity should be abolished, an argument far beyond the reach of the Court's power.

**1. Article III Standing**

The Defendants argue that the parents of the children lack standing to bring their individual § 1983 claims because their claims are predicated on alleged violations of the constitutional rights of others, *i.e.*, the children. Before a federal court can consider the merits of a legal claim, "the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Arkansas*, 495 U.S.149, 154 (1990). Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const., art. III, § 2. No case or controversy exists when a party lacks standing to sue. *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016). "Standing in federal court is determined entirely by Article III and depends in no degree on whether standing exists under state law." *Abraugh v. Altimus*, 26 F.4th 298, 303 (5th Cir. 2022) (citation modified).

Standing under Article III is evaluated on a claim-by-claim basis. *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021). To establish Article III standing, the party invoking federal jurisdiction bears the burden of showing (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," (3) which a favorable decision is likely to redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified). "An injury-in-fact constitutes 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 (5th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560). "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007)).

"In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). A litigant, however, may bring an action on behalf of a third party, provided three important criteria are met: (1) "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute;" (2) "the litigant must have a close relation to the third party" and must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests," such as inaccessibility, mental incompetence, or other disability. *Id.* at 410-11 (citations omitted); *Whitmore*, 495 U.S. at 163 (discussing standing in the context of next friend).

With this in mind, it is well established that a parent has Article III standing to file suit over the wrongful death of a child, and, conversely, a child has Article III standing to file suit over the wrongful death of a parent. *Abraugh,* 26 F.4th at 304. An administrator or representative of a deceased's estate likewise has standing, where the "estate has suffered an injury that the defendants are allegedly responsible for, and it seeks redress in the form of money damages." *Id.*

Furthermore, the Plaintiffs, as parents, have standing to act as next friends of the surviving children. "A 'next friend' does not himself become a party to the . . . action in which he participates, but simply pursues the cause on behalf of the [injured] person, who remains the real party in interest." *Whitmore,* 495 U.S. at 163. Minor children "are considered to be under a legal disability and are therefore unable to sue or be sued in their individual capacities; such persons are *required* to appear in court through a legal guardian, a 'next friend,' or a guardian ad litem." *Cf. Aus. Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005) (emphasis added). Parents, who have a "fundamental right to make decisions concerning the care, custody, and control" of

their children, certainly have standing to act as next friends of their minor children, absent a conflict of interest. *Troxel v. Granville*, 530 U.S. 57, 72 (2000); *see also In re KC Greenhouse Patio Apartments, LP*, 445 S.W.3d 168, 174-76 (Tex. App. 2012).[7]

However, to the extent that the Plaintiffs with *surviving* children are asserting their own individual claims of constitutional violations, those claims must be dismissed for lack of standing. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quoting U.S. Const. amend. IV).[8] And under the Fourteenth Amendment, a parent has a fundamental due process right to make decisions concerning "companionship, care, custody, and management of his or her children . . . ." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Quillon v. Walcott*, 434 U.S. 246, 255 (1978). This right includes a "cognizable liberty interest in preserving the life and physical safety of [a minor child] from deprivations caused by state action, a right that logically extends from his recognized liberty interest in the custody of his children and the maintenance and integrity of the family . . . ." *Est. of Bailey ex rel. Oare v. York County*, 768 F.2d 503, 509 n.7 (3d Cir. 1985).

---

[7] The Plaintiffs also have *prudential* standing as wrongful death beneficiaries, representatives of the estates of the deceased children, and as next friend. Prudential standing is not a jurisdictional question but a merits question: "who, according to the governing substantive law, is entitled to enforce the right?" *Abraugh,* 26 F.4th at 304. 42 U.S.C. § 1988(a) provides that a court must look to the law of the forum state to determine the survival of civil rights actions. Pursuant to Texas's wrongful death statute, Tex. Civ. Prac. & Rem. § 71.004(a), and survival statute, Tex. Civ. Prac. & Rem. § 71.021(b), surviving parents may assert claims based on injuries arising out of the deprivation of their deceased child's constitutionally secured liberties. *Cf. Rhyne v. Henderson County*, 973 F.2d 386, 389-91 (5th Cir. 1992) (holding that mother of pretrial detainee who committed suicide had individual standing under § 1983 and § 1988 to recover for her injuries); *Rodgers v. Lancaster Police & Fire Dept.*, 819 F.3d 205, 208-09 (5th Cir. 2016). The personal representatives of estates also have the capacity to bring survival claims under Texas law. *Lovato*, 171 S.W.3d at 850. Finally, both state and federal law permit parents and guardians to sue on behalf of their minor children. *See* Fed. R. Civ. P. 17; Tex. Fam. Code § 151.001(a)(7).

[8] The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979).

The Plaintiffs contend that, while establishing a perimeter around Robb Elementary, the Law Enforcement Defendants impermissibly restrained parents in violation of their Fourth and Fourteenth Amendment rights. Namely, they allege that law enforcement officers knocked down, handcuffed, and even tasered several parents attempting to reach their children. However, the Plaintiffs fail to indicate who, if any, of the named parties were personally restrained or injured by these actions. In other words, the Plaintiffs merely allege that the Law Enforcement Defendants violated the constitutional rights of other parents and not their own rights. Therefore, the Plaintiffs of the surviving children have failed to establish that they *individually* suffered injuries in fact, and the Court lacks jurisdiction to adjudicate these claims.

Finally, no parent has Article III standing to bring an individual claim based on a state created danger or failure to protect. These claims also fall under the due process clause of the Fourteenth Amendment. But the alleged state action supporting these claims was directed at the children, not the parents. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160-61 (5th Cir. 1986) (finding no violation of the plaintiff's personal rights). And any harm the Plaintiffs suffered was indirect mental anguish, at most.[9] This type of harm is not fairly traceable to the alleged conduct of the Defendants and cannot constitute an injury in fact. Therefore, these individual claims of the Plaintiffs representing the surviving children must be dismissed under Rule 12(b)(1).

**B. Rule 12(b)(6)**

Next, the Court will address the Defendants' Rule 12(b)(6) arguments. Rule 12(b)(6) allows a party to file a motion to dismiss based on a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[9] Moreover, there is no constitutional right to be free from witnessing police action. *Grandstaff v. City of Borger*, 767 F.2d 161, 172 (5th Cir. 1985).

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (citation modified).

When determining whether a claim is properly stated, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotations omitted). However, the court cannot "accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quotations omitted). In ruling on a Rule 12(b)(6) motion to dismiss, courts generally should not go beyond the pleadings and "must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996); Fed R. Civ. P. 12(d).

The Law Enforcement Defendants rely on qualified immunity as a basis for dismissal. The doctrine of qualified immunity shields government officials from liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lincoln v. Turner*, 874 F.3d 833, 847 (5th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Id.* (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)). A plaintiff seeking to defeat qualified immunity

must plead sufficient facts to show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts may look into either prong of the qualified immunity inquiry first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lincoln v. Barnes*, 855 F.3d 297, 301 (5th Cir. 2017) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This inquiry 'does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

**1. Law Enforcement Defendants**[10]

---

[10] "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. The Plaintiffs, however, rely on bystander liability, where an officer may be liable under § 1983" if "the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002)). The Court concludes that it is unnecessary to address whether bystander liability applies here. Considering the acts collectively and assuming each law enforcement officer knew of the acts of the others and acquiesced in their conduct, the Plaintiffs nonetheless fail to overcome the defense of qualified immunity.

The Law Enforcement Defendants all seek dismissal of the Plaintiffs' § 1983 claims under Rules 12(b)(6). "To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). The parties do not dispute that the Law Enforcement Defendants were acting under color of state law—only whether the Plaintiffs adequately allege a violation of constitutional rights and whether that right was clearly established.

**a. Fourth Amendment Claim**

The Plaintiffs' first basis for their § 1983 claims is a violation of the Fourth Amendment, where the Plaintiffs argue that the teachers and students were unlawfully seized by the Law Enforcement Defendants. The seizure of a person for Fourth Amendment purposes "can take the form of physical force or a show of authority that in some way restrains the liberty of the person." *Madrid*, 592 U.S. at 311 (citation modified) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). A seizure occurs if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quotations omitted). "Physical force is not required to effect a seizure; however, absent physical force, '*submission* to the assertion of authority' is necessary." *McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

The Plaintiffs do not allege that the Law Enforcement Defendants physically seized those inside the classrooms or ever fired a gun, prior to BORTAC's entry into the classroom. Rather, they contend that the circumstances amounted to a seizure when the officers used a show of authority in surrounding the classroom with guns, resulting in involuntary confinement of the students and teachers who were "barricaded" and "trapped" inside and nearby with a killer. No

reasonable person under the circumstances, say the Plaintiffs, would have felt free to leave the classrooms for fear of being shot by law enforcement. They also argue that the active school shooter policy, which "required" students and teachers to stay in place until rescue by law enforcement, triggered a Fourth Amendment seizure.

The Plaintiffs have not alleged sufficient facts to show a plausible Fourth Amendment violation. Importantly, "[v]iolation of the Fourth Amendment requires an *intentional* acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (emphasis added). As the Supreme Court explained:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Id.* at 596-97. The general rule derived from *Brower* is that there can only be a Fourth Amendment seizure if that person was the "deliberate object" of the exertion of force intended to terminate freedom of movement. *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006); *see also Madrid*, 592 U.S. at 317 ("A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule.").

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002), is instructive in showing why the Plaintiffs' allegations are deficient. In *Ewolski*, police engaged in a two-day standoff with a hostage taker, who was holding his wife and son captive inside the home with a gun. Officers surrounded the home, broke down the door, and accidentally set part of the home on fire with an incendiary device. After they extinguished the fire, they reconvened, and the next day sent in an

armored vehicle, only to find the bodies of the hostage taker and his son. Tragically, the hostage taker shot his son and then killed himself.

The court held that the hostage taker was seized because he was not free to leave, *and* because the specific intent of the officers was to restrain him. *Id.* at 506. According to the court, (1) the officers' actions qualified "as an intentional application of physical force and show of authority made with the intent of acquiring physical control," and (2) "this assertion of force and authority succeeded in restraining [the hostage taker's] liberty to leave his home." *Id.* The court, however, concluded that the hostage taker's wife and son *were not seized* because there was no reason to believe that the officers were preventing them from leaving the house. *Id.* at 507. The court emphasized that "the clear objective of the police [was] to remove them from the house and remove them from the control of" the hostage taker. *Id.*

The Plaintiffs similarly fail to allege any facts that plausibly suggest the Law Enforcement Defendants intentionally applied physical force or a show of authority with the purpose of acquiring physical control over the teachers and students inside the classrooms. *Cf. Pierce v. Doe*, 849 F. App'x 472, 475 (5th Cir. 2021) (finding no Fourth Amendment seizure even where law enforcement deliberately shot through a window to subdue a hostage taker but accidentally shot the hostage); *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *4-5 (5th Cir. June 10, 2024) (intentional conduct required); *Childress v. City of Arapaho*, 210 F.3d 1154, 1156-57 (10th Cir. 2000) (same). Rather, the only plausible reading of the Plaintiffs' allegations is that the shooter was the target, and the intent of surrounding the classrooms was to assert control over the shooter, not the victims. The Plaintiffs also fail to allege that the officers were preventing the students and teachers from leaving the classroom, aside from making a conclusory assertion that the active shooter policy and the officers' armed presence restrained the occupant's ability to leave

the classroom. Because the challenged conduct does not objectively manifest an intent to restrain the children or anyone else inside the classroom except for the shooter, the Fourth Amendment simply does not apply to the facts alleged.

Assuming the Plaintiffs could establish a Fourth Amendment violation, the Plaintiffs fall far short of defeating the Law Enforcement Defendants' assertion of qualified immunity. The Supreme Court has held that the "specificity" of the "clearly established" rule is "especially important in the Fourth Amendment context," *Mullenix*, 577 U.S. at 12, requiring a party to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," *White v. Pauly*, 580 U.S. 73, 79 (2017). The Plaintiffs have not identified a case in which the Supreme Court, the Fifth Circuit, or in fact any other circuit, found a Fourth Amendment violation under similar facts. The only comparable case that addresses a Fourth Amendment claim under similar circumstances, to the Court's knowledge, is *Ewolski*, 287 F.3d 492, which found no Fourth Amendment violation.[11] Therefore, the Law Enforcement Defendants are all entitled to qualified immunity and dismissal of the §1983 Fourth Amendment claims.

**b. Due Process Clause**

The Plaintiffs' next basis for their §1983 claims is a substantive due process violation of the Fourteenth Amendment. According to the Plaintiffs, the Law Enforcement Defendants had a duty to protect the children and teachers yet acted with deliberate indifference to known threats to their safety and well-being (1) by barricading them inside or nearby a classroom with a known murderer, and (2) by failing to adequately provide for their medical needs.

[11] The Plaintiffs argue that the Law Enforcement Defendants' ALERRT training, as well as the sheer obviousness of the need to quickly act to rescue the children, put them on notice that their acts were unconstitutional. They, therefore, claim that they need not identify a case on point. But state mandated training is in no way a constitutional directive. *Cf. Lewis v. Newton Bd. of Educ.*, CV156075650S, 2018 WL 2419001 (Conn. Super. Ct. May 7, 2018) (holding that lockdown procedures are discretionary and not ministerial). And the Plaintiffs have not otherwise alleged a clearly established constitutional violation.

The United States Constitution provides, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression." *Brown v. Nationsbank Corp.*, 188 F.3d 579, 591 (5th Cir. 1999). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Due process guarantees "more than fair process" and covers "a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotations omitted).

The Due Process Clause protects "the people from the State" but is not a guarantor of protection from each other. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (2002). Accordingly, "a State's failure to protect an individual against private violence [generally] does not constitute a violation of the Due Process Clause." *Id.* at 197. Furthermore, the Due Process Clause does not generally confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

Acknowledging the general rule that a state actor has no duty to protect, the Plaintiffs rely on two exceptions to this general rule: (1) the special custodial relationship exception; and (2) the state created danger exception.

***i. Special Relationship***

The special relationship exception to no duty to protect applies when the state, by a governmental order or the affirmative exercise of state power, "has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody

*and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety." *Doe ex. Rel. Magee v. Covington Cnty. Sch. Dist*, 675 F.3d 849, 857 (5th Cir. 2012) (quoting *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (en banc)). When a special relationship is created, a State assumes some responsibility for an individual's safekeeping and general well-being. *DeShaney*, 489 U.S. at 199-200. When the State acts with deliberate indifference to the safety and wellbeing of those within its care, it violates the individual's due process rights. *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002).

The Plaintiffs fail to allege sufficient facts to show the existence of a custodial relationship between the teachers, children, and the Law Enforcement Defendants. As the Supreme Court explains, the rationale for the exception to no duty to protect is simple enough:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.

*Deshaney*, 489 U.S. at 200. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.*

The custodial requirement of a special relationship is a "difficult and more exacting standard than for a Fourth Amendment seizure." *Pierce v. Springfield Twp.*, 562 F. App'x 431, 437 (6th Cir. 2014) (quotations omitted). Because of the stringent standard, the Fifth Circuit has recognized the exception in only three very limited circumstances, namely when the State (1) incarcerates a prisoner, (2) involuntarily commits someone to an institution, or (3) places a child

in foster care. *Magee,* 675 F.3d at 856. The Fifth Circuit has repeatedly held that "the state does *not* create a special relationship with children attending public schools" because "[p]ublic schools do not take students into custody and hold them there against their will in the same way that a state takes prisoners, involuntarily committed mental health patients, and foster children into its custody." *Id.* at 857-58; *Doe v. Hillsborough Indep. Sch. Dist.*, 113 F.3d 1412, 1414-15 (5th Cir. 1997) (en banc); *see also Walton,* 44 F.3d at 1305 (holding no special relationship existed between the state and a deaf student at a full-time, residential public school for the deaf because these students "attended this school voluntarily with the option of leaving at will"); *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020) ("School attendance, even when compelled by truancy and compulsory attendance laws, is not similar in kind to incarceration or institutional confinement."). "Without a special relationship, a public school has no *constitutional* duty to ensure that its students are safe from private violence." *Magee*, 675 F.3d at 858; *see also Johnson v. Dall. Indep. Sch. Dist.,* 38 F.3d 198, 202-03 (5th Cir. 1994) (finding no special relationship between a high school and a student shot and killed in the school hallway, during the school day, by a non-student who gained access to the school).[12] Surely, where no special relationship exists between the State and a student, no special relationship exists between the State and a teacher, where attendance by the teacher is purely voluntary.

The Plaintiffs attempt to circumvent these cases by alleging that the Law Enforcement Defendants created a custodial relationship with the students and teachers by trapping them in a manner similar to incarceration or institutional confinement with no ability to care for themselves,

[12] In the context of a school shooting by a non-student, the Fifth Circuit explained that an injury arising from private violence "is attributable to the fortuity that an armed, violent *non-student* trespassed on campus. There can be no liability of state actors for this random criminal act unless the fourteenth amendment were to make the schools virtual guarantors of student safety—a rule never yet adopted even for those in society, such as prisoners or the mentally ill or handicapped, who are the beneficiaries of a 'special relationship' with the state." *Johnson,* 38 F.3d at 203 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

and then acted with deliberate indifference to their safety by allowing the shooter to continue his rampage for a full 77 minutes. They also raise a novel argument that active school shooter policy, which requires students and teachers to remain in place until they are rescued by law enforcement, somehow creates a special relationship.

This argument fails for two reasons. First, the Law Enforcement Defendants' alleged actions are insufficient to show a custodial relationship. "[T]he mere exercise of 'control over an environment is alone insufficient' to bring an individual within *DeShaney's* custody exception." *Pierce,* 562 F. App'x at 437 (quoting *Carver v. City of Cincinnati*, 474 F.3d 283, 286 (6th Cir. 2007) (holding that officers' actions in securing a potential crime scene did not constitute custody)). Likewise, preventing a rescue effort does not create a custodial relationship. *Hale v. Bexar County*, 342 F. App'x 921 (5th Cir. 2009). Rather, the exception requires, at a minimum, "actual, physical restraint" by police. *Cutlip v. City of Toledo*, 488 F. App'x 107, 114 (6th Cir. 2012).

As previously discussed, the Plaintiffs have not plausibly alleged that the human barrier had the effect of seizing the children and teachers for purposes of the Fourth Amendment. Rather, any fair reading of the Plaintiffs' complaint shows that the intent of the barrier was to restrain the shooter and ultimately free, not restrain, those inside the classrooms. The Plaintiffs also fail to allege that the officers were preventing the children and teachers from leaving any classroom or the school grounds, aside from making a conclusory assertion that the officers' armed presence trapped the children and teachers inside the classrooms.

Second, a special relationship must exist *before* a state has "a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *Magee*, 675 F.3d at 863 (quoting *McClendon*, 305 F.3d at 324). "[T]he same act that creates the special

relationship [cannot] also violate the duty of care owed to the student." *See id.* at 862. Here, the act of surrounding the classrooms and barricading the school cannot simultaneously create the special relationship *and* violate the duty of care established by that relationship. Nationally implemented lockdown procedures also do not create that pre-existing special relationship, where the lockdown procedure does not actually rob an individual of the ability to act on their own behalf.[13] The law enforcement officers, therefore, had no constitutional duty to ensure that the children and teachers were safe from private violence. *See Salas v. Carpenter*, 980 F.2d 299, 309 (5th Cir. 1992) ("Generally, the absence of a special relationship defeats any due process claim based upon a failure to provide protective services.")

Even if the law enforcement officers' actions created a special relationship, existing case law falls far short of clearly establishing the violation of the children's and Mr. Reyes's substantive due process rights under such a theory. The Fifth Circuit has *never* recognized a special relationship in this context, and in fact, a similar argument has been rejected by this circuit, as well as others. *See, e.g., Hale,* 342 F. App'x at 926-27 (preventing the rescue of people exposed to a chlorine gas leak did not create a special relationship between the state and the victims); *Salas*, 980 F.2d at 308 (finding no constitutional violation when a sheriff prevented city officials from aiding a hostage, used incompetent hostage negotiators, and failed to provide adequate equipment to handle the hostage situation); *Peterson*, 982 F.3d at 1330 (rejecting the argument that the presence of armed school-safety officers amounted to custody); *Tanner v. County of Lenawee*, 452 F.3d 472 (6th Cir. 2006) (dismissing the notion that setting up a perimeter around a house and cutting off potentially lifesaving rescue restrained liberty or prevented the plaintiff from acting on

[13] Indeed, accepting the Plaintiffs' premise would mean that public schools are now universal guarantors of the safety of their students, simply because schools have taken extra steps to minimize harm in the event of an act of criminal violence on school property.

his own behalf). Therefore, the Law Enforcement Defendants are entitled to qualified immunity and dismissal of this claim.

***ii. State-Created Danger***

The Plaintiffs' reliance on a state-created danger theory of liability fares no better. The state-created danger exception to no duty to protect is a legal concept developed from dicta in *DeShaney* that holds state actors liable for harm committed by a private actor. For the exception to apply, a plaintiff, at a minimum, must show that "[1] the defendants used their authority to create a dangerous environment for the plaintiff and that [2] the defendants acted with deliberate indifference to the plight of the plaintiff." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537-38 (5th Cir. 2003). "To establish deliberate indifference for purposes of state-created danger, the plaintiff must show that '[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.'" *Magee,* 675 F.3d at 865 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001)). A claim may also exist when state actors "increase a person's vulnerability to private violence by interfering with protective services which otherwise would be available." *Salas*, 980 F.2d at 309 (citing *Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir. 1990)).

According to the Plaintiff, the act of surrounding the classrooms and essentially trapping the shooter in the classrooms increased the risk of harm to the children. But to the detriment of the Plaintiff, neither the Supreme Court nor the Fifth Circuit has explicitly adopted the state-created danger exception. In *Sterling v. City of Jackson*, 159 F.4th 361 (5th Cir. 2025), a Fifth Circuit panel briefly recognized the state-created danger doctrine as a viable theory for a substantive due process claim, where a city knowingly contaminated drinking water with lead and

then encouraged residents to drink the water. However, the Fifth Circuit as a whole quickly retreated from this position by granting a petition for rehearing en banc and vacating the opinion. 159 F.4th 361 (5th Cir. 2025). In the recently released en banc opinion, the majority avoided any mention of the phrase "state-created danger" and simply held that under the specific facts of *Sterling*, there was no due process right to bodily integrity. No. 24-60370, 2026 WL 2617771 (5th Cir. Sept. 4, 2026). In other words, the Fifth Circuit still has not explicitly adopted or rejected a state-created danger theory of liability, despite an opportunity to do so.

Regardless of the fate of state-created danger within the Fifth Circuit, the law was not clearly established at the time of the shooting. Although the Fifth Circuit has loosely articulated the elements of a cause of action, it "has repeatedly noted its unavailability." *Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1002 (5th Cir. 2014) (collecting cases); *see also Fisher v. Moore*, 73 F.4th 367, 369 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024) ("This circuit has never adopted a state-created danger exception to the sweeping 'no duty to protect' rule."); *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 688 (5th Cir. 2017) (emphasizing that Fifth Circuit panels have repeatedly noted the unavailability of a state-created-danger exception); *Williams v. Williams*, No. 23-20376, 2024 WL 811526, at *1 (5th Cir. Feb. 27, 2024) ("The appellant recognizes that she cannot prevail under this court's longstanding jurisprudence whereunder we do not recognize 'state-created danger' as a theory of liability for a claimed constitutional violation. Appellant asks the court to use this case as a vehicle to adopt, for the first time, that theory. We decline the invitation."); *Robinson v. Webster County*, 825 F. App'x 192, 196 (5th Cir. 2020) (same). The Law Enforcement Defendants would thus be entitled to qualified immunity and dismissal of these Fourteenth Amendment claims because "[a] *never*-established

right cannot be a *clearly* established one." *Fisher*, 73 F.4th at 369 (discussing the state-created danger exception).[14]

### 2. Official Capacity

Defendant Arredondo also seeks dismissal of the claims against him in his official capacity, as the Chief of Police of UCISD-PD on May 24, 2022. "Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Accordingly, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citations omitted). "Thus, when a plaintiff asserts claims against both the municipal entity and a municipal official in his or her official capacity, the Court can dismiss the official capacity claim as 'redundant' to the municipal-entity claim. *Bustillos v. El Paso Cnty. Hosp. Dist.*, 226 F. Supp. 3d 778, 789 (W.D. Tex. 2016) (quoting *Sanders–Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010)).

Because the Plaintiffs have sued UCISD, the real party in interest, any official capacity claims are redundant. The Court will therefore dismiss the official capacity claims against Arredondo.

---

[14] The Plaintiffs argue that they should be allowed to conduct extensive discovery to effectively build a case for recognizing state-created danger. But the purpose of qualified immunity is to protect a state actor from having to undergo the burden of discovery when the constitutional right is not clearly established. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

**3. Municipal Liability**

The Court now turns to the claims against UCISD. The Plaintiffs allege that UCISD, through the deliberate indifference of its final policymakers, had a custom and practice of noncompliance with regulations and protocols to ensure the safety and protection of the students and staff in the event of an active shooter incident; and this deliberate indifference was the driving force of their Fourteenth Amendment due process violations. They also allege that UCISD should be held liable for failing to train and/or supervise the law enforcement officers.

The Plaintiffs' claims cannot survive Rule 12(b)(6) scrutiny. A municipality or other local government entity may be liable under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692); *Moore*, 233 F.3d at 874 (noting that a school district may be held liable under § 1983 "for constitutional violations committed pursuant to a governmental policy or custom"). To successfully state a § 1983 claim against a municipality, a plaintiff must plead facts that plausibly establish "a policy maker, an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom." *Ratliff v. Aransas County*, 948 F.3d 281, 285 (5th Cir. 2020) (*quoting Piotrowski*, 237 F.3d at 578).

In addressing municipal liability under § 1983, a court must separate two different issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [governmental entity] is responsible for that violation." *Collins*, 503 U.S. at 120. If there is no underlying constitutional violation, dismissal is proper under Rule 12(b)(6). *Rios v. City of Del Rio*, 444 F.3d 417, 427 (5th Cir. 2006).

Local governments are only responsible for their own unlawful acts and "are not vicariously liable for their employees' actions." *Connick,* 563 U.S. at 60. However, a municipality may be liable for failing to train its employees when a constitutional violation committed by the employee results directly from a municipal custom or policy. *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000). To state a claim for failure to train, a plaintiff must plead three things: (1) inadequate training of the individuals involved; (2) the inadequate training caused a violation of the plaintiff's constitutional rights; and (3) the inadequate training "constituted deliberate indifference of municipal policymakers to the plaintiff's constitutional rights." *Bledsoe v. Willis*, 665 F. Supp. 3d 810, 824 (W.D. La. 2023) (citing *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)); see also *Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir. 1996). Importantly, governmental entities "cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Bustillos*, 891 F.3d at 222 (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 511 (6th Cir. 2012)); *see also Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc).

As previously discussed, the Plaintiffs have not established a violation of any constitutional right. To the extent that the Plaintiffs' claims are based on the Municipal Defendants' failure to train, a municipality cannot be deliberately indifferent to a policy that violates a constitutional right that is not clearly established. *Bustillos*, 891 F.3d at 222. In other words, even if the children's constitutional rights were violated, UCISD cannot be held liable for any failure to train because these constitutional rights were not clearly established at the time of the shooting. Therefore, UCISD is entitled to dismissal of the claims against it. *Id.*; *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that no case "authorizes the award of damages against a

municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm"); *Rios*, 44 F.3d at 425-26.

**C. Leave to Amend**

The next question is whether the Plaintiffs should be permitted to amend their complaint before dismissing the claims with prejudice under Rule 12(b)(6). Federal Rule of Civil Procedure 15(a)(2) counsels that the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Generally, courts should give plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case under Rule 12(b)(6)." *Pierce v. Hearne Indep. Sch. Dist.*, 600 F. App'x 194, 200 (5th Cir. 2015). However, a court need not allow amendment when there is substantial reason to deny leave, such as when amendment would be futile or the plaintiffs have already alleged their best case. *Id.*; *see also Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Amending a complaint is futile when "the theory presented in the amendment lacks legal foundation or because the theory has been adequately presented in a prior version of the complaint." *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 591 (5th Cir. 2016) (quotations omitted).

The Plaintiffs have already amended their complaint. And as the law stands in the Fifth Circuit, any additional amendments would be futile, where: (1) the Fourth Amendment does not apply to the alleged facts; (2) the Fifth Circuit has never officially adopted a due process claim based on a state-created danger theory; and (3) the Fifth Circuit has never before extended the "special relationship" exception to a school setting. *See Fisher*, 73 F.4th 367; *Doe v. Bridge City Indep. Sch. Dist.*, No. 20-40596, 2021 WL 4900296, at *2 (5th Cir. Oct. 20, 2021) (holding that amending to plead a custodial relationship between students and a school is futile under *DeShaney*). Even if the Fifth Circuit were to recognize these theories under the facts alleged, the

Defendants would nonetheless be entitled to dismissal, where the law falls far short of being clearly established. *Bustillos,* 891 F.3d at 222. Without a viable underlying clearly established constitutional claim, amending to allege additional facts is not warranted.

**D. TXDPS Does 1 through 84**

The claims against TXDPS Does 1 through 84 must also be dismissed. "A plaintiff should be given an opportunity through discovery to determine the identity of a defendant . . . ." *Hittle v. City of Garland*, 1 F.3d 1236, at *1 (5th Cir. 1993). But "if the plaintiff fails to name the defendant after a reasonable period of time, the claim is subject to dismissal for failure to prosecute." *Id.*; Fed. R. Civ. P. 41(b). Although the Court has discretion to dismiss a claim with or without prejudice, a dismissal with prejudice is permitted only "in the face of a clear record of delay or contumacious conduct by the plaintiff." *Colle v. Brazos County*, 981 F.2d 237, 243 (5th Cir. 1993) (quoting *Durham v. Fla. E. Coast Ry. Co.*, 385 F.2d 366, 368 (5th Cir. 1967)).

Dismissal with prejudice is warranted. The Plaintiffs have had a sufficient opportunity to determine the identity of the TXDPS Does. The shooting occurred on May 24, 2022, over four years ago. Shortly after, the federal government conducted a well-publicized investigation into the shooting, providing details about not only the shooter and his victims, but also the responding law enforcement agents and agencies. Over two years after filing suit, the Plaintiffs still have not identified the TXDPS Does.

Even if the Plaintiffs were allowed additional time to amend to name the Does, any such amendment would be futile. An amendment to substitute a named party for a "John Doe" does not relate back under Rule 15 of the Federal Rules of Civil Procedure. *See Jacobsen v. Osborne*, 133 F.3d 315 (5th Cir 1998). Therefore, any claims against the Does would likely be barred by § 1983's two-year statute of limitations period. *See Piotrowski*, 51 F.3d at 514 n.5. Even if there

was a basis for tolling the limitations period, there is no merit to the claims against the TXDPS Does, which are identical to the claims of the other Law Enforcement Defendants.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

(1) The claims against Defendant Mandy Gutierrez are **DISMISSED WITHOUT PREJUDICE**, pursuant to ECF No. 31 and Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, and her motion to dismiss [ECF No. 26] is **DENIED AS MOOT**;

(2) The Motions to Dismiss the Law Enforcement Defendants and the Municipal Defendants [ECF Nos. 20, 22, 23, 28, and 29] are **GRANTED**;

(3) The claims of the parent Plaintiffs who are asserting their own individual claims of constitutional violations are **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 12(b)(1) for want of jurisdiction;

(4) The official capacity claims against Defendant Arredondo are **DISMISSED WITH PREJUDICE** as duplicative and redundant;

(5) The remaining claims against the Law Enforcement Defendants and the Municipal Defendants are **DISMISSED WITH PREJUDICE** pursuant to Rule 12(b)(6) for failure to state a claim;

(6) The claims against TXDPS Does 1 through 84 are **DISMISSED WITH PREJUDICE,** pursuant to Rule 41(b) for failure to prosecute; and

(7) UCISD's motion to substitute counsel [ECF No. 54] is **GRANTED**.

SIGNED and ENTERED on this 29th day of September 2026.

ALIA MOSES
Chief United States District Judge